NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0593n.06

No. 16-3041

**FILED**
Nov 03, 2016
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| CAROL A. KIRKLAND, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| DEBORAH LEE JAMES, Secretary of The Air | ) | DISTRICT OF OHIO |
| Force, | ) | |
| | ) | OPINION |
| Defendant-Appellee. | ) | |
| | ) | |

**BEFORE:**   SUTTON and STRANCH, Circuit Judges; and STEEH, District Judge[*]

**JANE B. STRANCH, Circuit Judge.**   Carol Kirkland, an Air Force employee on Wright-Patterson Air Force Base in Ohio, brought claims for gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., against her employer, Deborah Lee James, Secretary of the Air Force.  Kirkland alleged that the defendant discriminated and retaliated against her by removing leave hours from her annual leave account. The district court granted summary judgment to the defendant.  For the following reasons, we **AFFIRM**.

## I.       BACKGROUND

Kirkland, a Program Manager, Directorate of Intelligence and Requirements on Wright-Patterson Air Force Base in Ohio, was deployed on temporary duty—known as "TDY"—to

---

[*]The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

Djibouti, Africa, from November 2010 to June 3, 2011. Prior to her deployment, Kirkland inquired about the procedures for keeping her "use or lose" leave hours, the annual leave time she had accrued that could not be carried over to the next year. Air Force employees accrue leave hours based on their years of service, and subject to some exceptions, may accumulate up to 240 hours of leave. *See* 5 U.S.C. §§ 6303; 6304(a). Hours accumulated above the 240-hour threshold are referred to as "use or lose" hours, and must be used by the end of the year or will be forfeited. 5 U.S.C. § 6304(a).

At the time of Kirkland's deployment in November 2010, she had accrued 104 use or lose hours. Kirkland's Timekeeper and Customer Service Representative, Kathy Taylor, told her that these hours would be automatically restored to her while she was on temporary duty. Taylor subsequently restored Kirkland's 104 hours by placing them into a Restored Annual Leave ("RAL") account, a type of account used to hold annual leave hours in excess of the maximum number an employee can typically carry over into the next year, if those hours were forfeited due to "'exigencies of service' and the leave was scheduled in advance."

Kirkland returned from Djibouti in June 2011. Between her return and the end of the year, she used a total of 188.5 hours. During this time, Kirkland made two more requests for Taylor to place additional leave hours in her RAL account, and asked to have her leave ceiling increased from 240 to 360 hours based on her deployment to Djibouti. Taylor placed 109 additional hours in Kirkland's RAL account, as requested, but did not increase her leave ceiling.

Shortly after returning from deployment, Kirkland began the process of submitting an EEO grievance against her supervisor, Dan Faulkner, alleging that he had unfairly given her an "insufficient performance rating, made a motion to pursue discipline against her, and took

actions regarding her pay." Throughout the grievance process, Employee Management Relations representatives Nellie "Angie" Saylor and Susan Nelson provided "guidance and support" to Faulkner. (*Id.*) A few months after Kirkland initiated the grievance process against Faulkner, he and Saylor had an email exchange regarding Kirkland's leave. In an email to Faulkner, Saylor stated that, "Yes, Carol Kirkland's leave ha[d] been restored," and requested the name of Kirkland's customer service representative so that she could contact her for "some information [Saylor's] office need[ed] to obtain." After Faulkner provided Taylor's name, Saylor emailed Taylor to inquire about the restoration of Kirkland's leave hours, including "how [it] came about, whom initiated it and why, what research was done to determine her eligibility and who conducted the research as well as any documentation [Taylor] might have."

In early 2012, Saylor and Nelson began asking Kirkland questions about her eligibility for leave hour restoration or an adjustment to her leave ceiling. Saylor also asked her about her assignment to Djibouti. Kirkland responded to the requests by providing documents on multiple occasions, including letters showing she had responded to recruitment for deployment, her official orders, and documents showing her purpose of travel and location.

Nelson took over sole responsibility for issues related to Kirkland's leave hours in May 2012. After reviewing her deployment orders and Leave and Earnings Statements, she notified Kirkland that proper procedures had not been followed to restore the 104 use or lose hours she had forfeited in 2010, though she was entitled to the hours based on her deployment. Nelson also determined that Kirkland was not entitled to the 109 additional hours that had been restored to her account, because most of those hours were never forfeited. Nelson noted that Kirkland had actually used most of these hours between her return from Djibouti in June and the end of 2011, leaving only 19.5 use or lose hours forfeited. While Kirkland's deployment served as an

"exigency" that would support restoring 104 hours in 2010, it could not do the same for hours accrued after the date of her return in 2011. To show she was entitled to the 19.5 hours she forfeited in 2011, Kirkland would have to provide additional documentation. Finally, Nelson explained that Kirkland was not entitled to increase her leave ceiling because she had been on temporary duty, or "TDY," while deployed. Employees on TDY assignments are limited to the 240 hour maximum, in contrast to those assigned to a permanent or temporary change in station ("TCS" or "PCS"), who may increase their leave ceiling to 360 hours.

Around this time, other Air Force employees stationed at Wright-Patterson in positions similar to Kirkland's were also being deployed abroad in support of Operation Enduring Freedom. Thomas Lockhart was deployed on temporary duty to Iraq from September 2010 to February 2011, and again from May to September 2011. Kirkland remembered speaking to Lockhart about his deployment during the time she was communicating with Saylor and Nelson, and asking him whether he had any problems getting "his [leave] hours kept on the books." But Lockhart did not recall the conversation. Nor did he request any leave restoration or have any leave restored at this time, because he was able to accumulate and take leave during his deployment and did not earn "sufficient leave to even warrant requesting an increase" to his leave ceiling.

Dwaine Young, also a Program Manager and of the same rank as Kirkland, was deployed on temporary duty to Iraq from April 2010 to November 2011. He forfeited 88 hours of annual leave in 2010, which he subsequently requested and was restored. Sometime in February 2011, Young's leave ceiling was changed from 240 to 360 hours. The defendant states only that this change was an administrative error, which Nelson says was not discovered until June 2012. The defendant subsequently chose to change Young's leave ceiling back to 240 hours, but placed 120

hours (the difference between 240 and 360 hours) in his RAL account. At some point during this period, Kirkland overheard Young and Donald Krusynski, their mutual supervisor at the time, "talking about [Young's] leave hours being placed in a restored account." She later spoke to Young about his experience and confirmed that he had not lost any hours.

The following leave year, ending in January 2012, Young requested 116 hours of annual leave that he had forfeited while deployed during portions of 2011. Since Young was not prohibited from taking leave after returning from deployment in November 2011, he was told that he would need to provide documentation to show that an exigency had prevented him from using his accrued leave before the end of the leave year. When he did not provide such documentation, the 116 hours were forfeited.

Over the course of 2012, Nelson continued to investigate her interpretation of the leave restoration process and leave ceiling limitations as part of an audit into Kirkland's leave history. In mid-July, she emailed the Air Force Civilian Deployment Management Branch for guidance on whether employees on TDY orders were entitled to increase their leave ceilings above 240 hours, as Kirkland had requested. A Performance Program Manager confirmed Nelson's position that "employees in a TDY from a duty station in the U.S. will experience no change to their leave accrual and carryover, and will be limited to the normal 240 hours."

On July 23, 2012, Nelson and Saylor attended a mediation regarding Kirkland's claims against her supervisor, Faulkner, and "provided information" on Faulkner's behalf. Kirkland's claim was settled through the mediation, and approximately one week later she was moved from Faulkner's supervision and assigned to a new interim supervisor, Donald Kruszynski.

Questions about Kirkland's leave accrual and restoration, however, continued. Nelson and her supervisor, Brenda Thomas, held an in-person meeting with Kirkland to discuss her

leave accrual issues. During the meeting, Kirkland stated that Faulkner had "cancelled a leave request resulting in the loss of the 19.5 hours" at the end of 2011 and that she would provide documentation to support this claim, but failed to do so. After the meeting, Nelson and Thomas contacted Headquarters Air Force and Air Force Materiel Command to confirm their interpretations of the leave policy. A representative from Labor and Employee Relations confirmed that when an employee returns from deployment in the middle of the leave year, the policy for deployed employees would no longer apply at the end of the leave year. The representative also confirmed that employees on TDY orders were not eligible to increase their leave ceilings above 240 hours.

Following this clarification, Robin E. Williams, Chief of Labor & Employee Management Relations at the Civil Personnel Office, issued a memorandum to Kirkland explaining that she was not entitled to increase her leave ceiling due to her TDY status during deployment. The memorandum also stated that, as a result of Kirkland's request for corrections to leave in her RAL account, her office had conducted an audit of Kirkland's Master Leave History to determine how much annual leave met the requirements for restoration in accordance with 5 U.S.C. § 6304(d). The audit found that Kirkland had forfeited 19.5 use or lose hours in 2011, and that while she had not established a valid exigency for their restoration, she could still do so by providing documentation. Finally, the audit found that 89.5 leave hours from 2011 had been improperly restored to Kirkland's RAL account, because Kirkland had actually used the leave following her return from Djibouti. The memorandum notified Kirkland that these hours would be removed from her account.

Kirkland filed a complaint in District Court in December 2013, alleging discrimination on the basis of sex and retaliation in violation of Title VII. Defendant's motion for summary

judgment was granted. The court concluded that Kirkland failed to establish a prima facie claim for either sex discrimination or retaliation, and she could not show that the defendant's proffered reasons for denying her leave or refusing to increase her leave ceiling were pretext for discrimination. Kirkland challenges the district court's determination that she has not satisfied the standard for a prima facie case of sex discrimination or retaliation, as articulated in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), as well as the district court's analysis of pretext.

## II. ANALYSIS

This court reviews a district court's grant of summary judgment de novo and considers the facts and any inferences drawn in the light most favorable to the non-moving party. *Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1021-22 (6th Cir. 2013). Summary judgment is appropriate when there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a). The burden falls to the moving party to demonstrate that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The central inquiry at the summary judgment stage is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### A. Step 1 – Prima Facie Case

The district court determined that Kirkland could not establish a prima facie case of gender discrimination because she could not show that another similarly situated employee outside of her protected class was treated more favorably with respect to leave hours. The court also rejected Kirkland's retaliation claim, ruling that she had failed to establish a prima facie

claim because she was not "treated differently than her peers" and did not establish a causal connection to her previous EEO activity.

Title VII prohibits an employer from discriminating against any person regarding the terms, conditions, or privileges of employment because of sex, and from "discriminat[ing] against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. §§ 2000e-2(a)(1); 2000e-3(a). To establish a claim of discrimination under Title VII, a plaintiff must present either direct or circumstantial evidence of discrimination by an employer. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015). Where, as in Kirkland's case, a plaintiff offers no direct evidence of discrimination by the employer, courts apply the burden-shifting inquiry set forth in *McDonnell Douglas*. *See* 411 U.S. at 802-03; *see also Wheat*, 785 F.3d at 237; *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 673 (6th Cir. 2013), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013).

For both a sex discrimination and retaliation claim, the first step of *McDonnell Douglas* requires a plaintiff to establish a prima facie case. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016); *Fuhr*, 710 F.3d at 674. Upon proof of a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employment decision. *Wheat*, 785 F.3d at 237; *see also Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 653 (6th Cir. 2012). If the employer provides such a reason, the burden shifts back to the plaintiff to show that "the legitimate reasons offered by the employer were not its true reasons, but rather were pretext for unlawful discrimination." *Ondricko*, 689 F.3d at 653. We have "held consistently that a plaintiff's burden of establishing a prima facie case is not an onerous one." *Wheat*, 785 F.3d at 237.

To establish a prima facie case of sex discrimination, a plaintiff must show that she was (1) a member of a protected class, (2) subjected to an adverse action, (3) qualified for the job, and that (4) another similarly situated employee, not in the protected class, was treated more favorably. *Jackson*, 814 F.3d at 776. Similarly, the plaintiff has the initial burden of establishing a prima facie case of retaliation, which also consists of four elements: (1) the plaintiff engaged in activity protected under Title VII, (2) the exercise of plaintiff's protected rights was known to the defendant, (3) the defendant subsequently took an adverse employment action against the employee "or the employee was subjected to severe or pervasive retaliatory harassment by a supervisor," and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Fuhr*, 710 F.3d at 674. Our caselaw explains that a causal connection is established when the plaintiff "proffer[s] evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).

In analyzing the prima facie case in each of Kirkland's claims, the district court relied on older, out of circuit or unpublished cases. For example, in analyzing Kirkland's sex discrimination claim, the district court's holding cited only *Dartmouth Review v. Dartmouth*, 889 F.2d 13 (1st Cir. 1989), *overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir. 2004), without reference to our applicable precedent. In *Ercegovich v. Goodyear Tire & Rubber Company*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802) (6th Cir. 1994)), we explained that a plaintiff is not required to "demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated,'" and that they need

only be "similar in 'all of the *relevant* aspects.'" *See also Jackson*, 814 F.3d at 777. Whether or not the differing treatment was justified by a legitimate, nondiscriminatory reason, moreover, is a question left for the third step—pretext. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000) (stating that, "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff"). At the prima facie stage, all a plaintiff must show is that a similarly-situated comparator was given favorable treatment.

Under the facts of this case, however, we need not resolve whether Kirkland made a prima facie case of discrimination or retaliation because her claims fail at step three—she has not shown that the Air Force's neutral reasons for reducing her leave hours were pretextual. We turn to that analysis now.

### B.  Steps Two and Three – Reasons and Pretext

Following the prima face analysis, the *McDonnell Douglas* framework asks whether the defendant has met its burden of offering a legitimate, non-discriminatory reason for the action, and then whether the plaintiff can show that the proffered reason is a pretext for discrimination. *See Jackson*, 814 F.3d at 778-79.

The defendant asserts three reasons to justify the actions taken against Kirkland: (1) she was not entitled to a leave ceiling increase because 5 U.S.C. § 6304(b) only applies to Air Force employees on PCS or TCS deployment orders, and Kirkland's orders were for TDY deployment; (2) 89.5 hours were removed from her RAL account because they were never actually forfeited, and Kirkland failed to provide documentation to show she was entitled to their restoration; and (3) 19.5 forfeited hours from 2011 were not restored to her account because she did not provide

documentation for them. The defendant has met its burden of articulating legitimate, non-discriminatory reasons for its actions regarding Kirkland's leave.

The district court concluded that summary judgment was also appropriate because Kirkland could not show that the defendant's reasons for removing her leave hours were pretext for discrimination. A plaintiff can meet her burden on this step of the *McDonnell Douglas* test by showing that the employer's proffered reasons (1) have no basis in fact; (2) did not actually motivate the adverse action; or (3) were insufficient to explain the adverse action. *See Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) (citing *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc)). A plaintiff must produce "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Braithwaite v. Timkin Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001). In keeping with the burden required at the summary judgment stage, a plaintiff "need only identify genuine disputes of fact regarding the legitimacy of the defendant's stated reasons." *Wheat*, 785 F.3d at 240.

Kirkland has not met this burden. She argues that the reasons provided by the defendant are pretextual because: her hours were removed despite statements from Taylor that they would be automatically restored, the actions were taken outside the scope of Nelson and Saylor's job duties, Kirkland's leave was frozen for one year while determining her correct leave hour eligibility, and the wrong policy was used to determine the number of hours she was ultimately entitled to. Even viewing the facts in the light most favorable to Kirkland, these assertions do not create a reasonable inference that the defendant's proffered reasons were illegitimate or masked a discriminatory or retaliatory motive.

First, Taylor's representations that Kirkland was entitled to automatic leave restoration are not evidence that the defendant's explanation for her leave removal is pretext. Taylor's statements referred to the 104 hours of leave that Kirkland forfeited at the end of 2010 due to her deployment. Taylor never responded to Kirkland's request to increase her leave ceiling to 360 hours. Moreover, Taylor's subsequent actions restoring these 104 hours without documentation, as well as 109 hours from 2011 without documentation, were inconsistent with Air Force policy regarding employees deployed on TDY orders. Nelson and Saylor ultimately determined, through research confirmed by Headquarters Air Force and Air Force Materiel Command, that Kirkland was not entitled to restoration of these 109 hours without further documentation, nor an increase in her leave ceiling based on her deployment status. Kirkland has not shown that the discrepancy between Taylor's representations and the subsequent removal of her leave hours was due to anything other than an analysis of Air Force rules and regulations.

Second, Kirkland also states that Nelson and Saylor acted outside their job duties. Kirkland's assertions are without any supporting evidence. Nelson herself states that her job duties as a Human Resources Specialist (Employee Relations) include "advising management on a wide range of . . . conduct and performance issues . . . including leave and absences." Saylor occupied the same position as Nelson. Kirkland's conclusory allegations are insufficient to meet the burden of showing that the defendant's proffered reasons are pretext for discrimination.

Third, Kirkland states that her leave was frozen for a year during the inquiry into her leave restoration without justification. The issue is not that Kirkland's hours were frozen, but whether it was done as pretext for discrimination or retaliation. The record is unclear on when her leave was frozen, for how long, and how it was communicated to her. Kirkland's December 2011 emails to Taylor indicate that she was able to take leave at that point, as she states that she

was using some of her hours before the end of the year so as not to lose them. Starting in February 2012, Nelson and others were investigating the proper number of hours Kirkland was entitled to, which would have justified a temporary freeze on her use of those hours. Kirkland has not shown that her hours were frozen for any reason other than to ensure that proper Air Force rules and regulations were followed.

Finally, Kirkland argues that the defendant applied an incorrect policy in determining her leave hours, and she should have been eligible for a leave ceiling increase under 5 U.S.C. § 6304(b). Kirkland does not dispute that she was on TDY orders in Djibouti, but states that her leave ceiling should have been increased because she was an employee assigned to a combat zone. Under the policy interpretation used by Nelson and Thomas and asserted by the defendant, these designations are not mutually exclusive. Rather, the relevant distinction is between employees deployed on TDY orders versus PCS or TCS orders. This understanding of the applicability of § 6304(b) was confirmed by Headquarters Air Force and Air Force Materiel Command. Kirkland has failed to provide evidence that she met the requirements for an increased leave ceiling under § 6304(b) either as an employee deployed on TCS or PCS orders, or that the statute should also apply to her deployment on TDY orders.

As reasons for the actions taken against Kirkland, the defendant cites its rules and regulations governing leave for employees deployed on TDY orders and its policies regarding the documentation required to show that forfeited leave should be restored. Kirkland fails to provide sufficient evidence to show that these policies have no basis in fact, did not actually motivate the adverse action against her, or are insufficient to explain the adverse action. Kirkland does not dispute that she was on TDY orders, nor that she used 188.5 hours of leave— which includes the 109 hours the defendant states were erroneously placed into her RAL

account—after returning from Djibouti in June 2011. The evidence Kirkland offers fails to meet her burden of showing that the defendant removed leave from her account as a pretext for either sex discrimination or retaliation.

## III.    CONCLUSION

Kirkland has not shown that the defendant's proffered reasons for removing her leave hours were pretext. For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to defendant.